B & K MECHANICAL, INC., Plaintiff,

v.

FEDERAL INSURANCE COMPANY, National Council on Compensation Insurance, Inc., and The Travelers Indemnity Company, Defendants.

No. CIV. A. 97–4008–DES.

United States District Court,
D. Kansas.

June 2, 1998.

Justice B. King, Fisher, Patterson, Sayler & Smith, Topeka, KS, for B & K Mechanical, Inc.

Lynn W. Hursh, Douglas R. Richmond, Gerald A. King, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, for National Council on Compensation Insurance, Inc., Travelers Indemnity Company.

Lynn W. Hursh, Douglas R. Richmond, Gerald A. King, Brian Edward Engel, Orion Riggs, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, for Federal Ins. Co.

### MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on defendants' Motion for Summary Judgment (Doc. 20) and Counterclaimant Federal Insurance Company's Motion for Summary Judgment (Doc. 18).

## I. INTRODUCTION

B & K Mechanical, Inc. ("B & K"), is an Americus, Kansas, based company which performs industrial construction and millwork in various states. B & K sought workers' compensation insurance through defendant, National Council on Compensation Insurance, Inc. ("NCCI"), in January of 1995. NCCI administers workers' compensation insurance assigned risk plans in several states, including Kansas and Iowa. At the time that B & K first sought workers' compensation insurance, it operated from its principal office in Americus, Kansas, and all of its job sites were located in Iowa. Defendant and coun-

terclaimant Federal Insurance Company ("Federal") is one of the insurers to which NCCI assigns insureds under the Iowa Workers' Compensation Insurance Plan ("Iowa Plan"). By agreement, defendant The Travelers Indemnity Company ("Travelers") administers Federal's assigned business in Iowa.

Shortly after B & K was incorporated in January of 1995, Robert Howard, B & K's president and sole shareholder, sought workers' compensation insurance in the voluntary market. When he was unable to obtain insurance in the voluntary market because the company had no loss experience history, B & K was forced to seek workers' compensation insurance through the involuntary market and submitted an application to NCCI.

Although B & K initially applied with NCCI through the Kansas assigned risk pool, this application was referred to Iowa because all of B & K's job sites were located in Iowa at that time. B & K questioned the assignment to Iowa, but was informed that NCCI rules required the assignment. Because B & K estimated payroll only in Iowa, NCCI bound the risk with Federal through the Iowa Plan. Federal then issued a workers' compensation policy to B & K for Iowa for the period from January 26, 1995, to January 26, 1996 (the "1995–1996 policy"). However, Federal was not able to issue a policy which covered B & K's clerical workers in Kansas. B & K was later able to obtain workers' compensation insurance for its clerical workers in Kansas through NCCI.

The 1995–1996 policy lapsed at the expiration date. Federal later issued a new workers' compensation policy for the period from February 9, 1996, to January 26, 1997. This case arises from a premium dispute involving the 1995–1996 policy and a coverage dispute involving the 1996–1997 policy. Other facts will be discussed as necessary.

## II. SUMMARY JUDGMENT STANDARD

A court shall render summary judgment upon a showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1985). The substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. 2505. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos Nat'l Laboratory,* 992 F.2d 1033, 1036 (10th Cir.1993). The movant may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1985). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. 2548.

Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (interpreting Fed. R.Civ.P. 56(e)). Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. 2548. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. 2548.

A court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block,* 788 F.2d

1433, 1435 (10th Cir.1986) (stating that "[t]he court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues"). The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for a finder of fact to return a verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. 2505.

## III. DISCUSSION

### A. Defendants' Motion for Summary Judgment (Doc. 20)

#### 1. Declaratory Judgment Action

The defendants first claim that B & K's request for a declaratory judgment does not present a justiciable issue. In support of this contention, the defendants argue that B & K is merely trying to pay as little premium as possible on the 1995–1996 policy in order to obtain coverage again in states where NCCI administers the workers' compensation insurance assigned risk plans. Therefore, the defendants argue that this is moot because B & K has been able to obtain coverage in every state in which it has done business. The defendants further argue that B & K's declaratory judgment action is improper because there was an equally adequate and appropriate remedy available—B & K could raise its arguments as affirmative defenses to Federal's counterclaim for breach of contract.

B & K asserts, however, that the justiciable issue in this case involves the controversy over the amount of premium that is owed to Federal for the coverage that was provided. However, plaintiff seems to acknowledge that this is essentially the same issue that is raised by Federal's counterclaim. Plaintiff seems to assert that the court could proceed on either the declaratory judgment claim or Federal's counterclaim for breach of contract.

The Declaratory Judgment Act provides in relevant part as follows:

(a) In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201. "This is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Pub. Serv. Comm'n of Utah v. Wycoff Co.,* 344 U.S. 237, 241, 73 S.Ct. 236, 97 L.Ed. 291 (1952).

The court notes that the plaintiff is seeking a declaration of the amount owing to defendant Federal as premium for the 1995–1996 policy and a declaration that the premium retained by Federal on the 1996–1997 policy should offset the amount owed on the 1995–1996 policy. Therefore, it seems that this claim should be directed toward Federal alone. Any action taken by the other defendants as a result of the amount owing to Federal would be covered by plaintiff's claim for tortious interference with a prospective business advantage. Because the plaintiff's claim for declaratory judgment relief is so closely tied to defendant Federal's counterclaim, the court finds that it is more appropriate to consolidate plaintiff's claims for declaratory relief with defendant Federal's counterclaim.

#### 2. Tortious Interference with a Prospective Business Advantage

B & K also alleges that all of the defendants have tortiously interfered with its prospective business advantages or relationships, causing B & K to sustain losses and incur expenses. The defendants respond that B & K cannot make a *prima facie* case for tortious interference with a prospective business advantage.

In order to state a claim for tortious interference with a prospective business advantage, the plaintiff must prove the following elements:

(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectan-

cy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

*Reazin v. Blue Cross and Blue Shield of Kansas,* 899 F.2d 951, 977 (10th Cir.1990) (quoting *Turner v. Halliburton Co.,* 240 Kan. 1, 722 P.2d 1106, 1115 (1986)). Furthermore, [t]ortious interference with a prospective business relationship requires some type of communication between the defendant and the third party in which the defendant induces the third party not to engage in a prospective contract or business relation with the plaintiff. A plaintiff claiming improper influence must demonstrate that the defendant knew of prospective contractual relations but intentionally interfered with them without justification.

*DP–Tek, Inc. v. AT&T Global Information Solutions Co.,* 891 F.Supp. 1510, 1520 (D.Kan.1995), *aff'd,* 100 F.3d 828 (10th Cir. 1996).

■ The first element to prove a *prima facie* case is the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff. The defendants seem to admit that plaintiff has proven this element, but only with respect to one construction job in Iowa which B & K alleges that it lost because it could not provide a certificate of insurance. However, B & K argues that it should not be limited to just this one incident. Instead, plaintiff argues that the expectancy does not need to be certain for the plaintiff to prevail. Therefore, plaintiff argues that the continuation of plaintiff's business is the expectancy of future economic benefit because the defendants knew that B & K needed to maintain workers' compensation insurance. However, plaintiff cites no case law which supports this position, and plaintiff has, in fact, been able to obtain workers' compensation insurance coverage as needed. Therefore, the court finds that plaintiff has met this element only with respect to the one construction job which was lost in Iowa.

■ The second element of tortious interference with a prospective business advantage is knowledge of the business relationship or expectancy by the defendant. The defendants argue that they had no knowledge of the lost construction job in Iowa or any other job that B & K may have lost. Plaintiff responds that it does not have to prove actual knowledge by the defendants. Instead, plaintiff contends that it merely needs to show that "the defendant[s] had knowledge of facts which, if followed by reasonable inquiry, would have led to complete disclosure of the relations and rights of the parties." *Continental Research, Inc. v. Cruttenden, Podesta & Miller,* 222 F.Supp. 190, 199 (D.Minn.1963). Therefore, plaintiff argues that the defendants knew or should have known that the continuation of B & K's business was dependant upon its ability to maintain workers' compensation insurance, and that B & K could only obtain this insurance through the involuntary market. Plaintiff further argues that the defendants knew, or should have known, that B & K performed industrial construction and millwright work on a bid basis and that "blacklisting" B & K from the involuntary insurance markets controlled by NCCI would have a potentially devastating impact on B & K's business.

The court finds that plaintiff's argument is too general to support liability for tortious interference with a prospective business advantage. Plaintiff has not presented any evidence that any of the defendants had any knowledge relating to future construction jobs. Plaintiff has not even shown that the defendants had knowledge of the one construction job that B & K actually lost because it could not provide proof of workers' compensation insurance. Therefore, the court finds that the plaintiff has not met its burden with regard to this element.

Although plaintiff may be able to prove the third element—that, except for the conduct of the defendants, plaintiff was reasonably certain to have continued the relationship or realized the expectancy—with regard to the one lost job in Iowa, the court finds that plaintiff also has not met its burden of proof with respect to the fourth element, which requires a showing of intentional misconduct

by the defendants. Plaintiff argues that "[w]here the defendant was aware of a business contract or future business profit, the element of 'intent' will be supplied," citing an 1898 Illinois case. However, this case does not support plaintiff's position. Plaintiff further asserts that the intentional misconduct in this case consists of failing to reasonably interpret applicable NCCI guidelines, refusing to accept plaintiff's attempts to pay undisputed premium amounts, and implementing procedures by which B & K was denied insurance coverage in the involuntary market in states where NCCI was the plan administrator. The court finds that the "intentional misconduct" cited by the plaintiffs amounts to no more than a dispute over the application of NCCI policies. Therefore, the court concludes that plaintiff has made an insufficient showing on this element, as well.

Because the court has concluded that the plaintiff has failed to meet its burden on two of the first four elements to prove a *prima facie* case for tortious interference with a prospective business advantage, it is not necessary for the court to discuss the final element of damages. Therefore, the court concludes that it is appropriate to grant the defendants' Motion for Summary Judgment with respect to plaintiff's claim for tortious interference with a prospective business advantage.

### B. Counterclaimant Federal Insurance Company's Motion for Summary Judgment (Doc. 18)

Counterclaimant Federal also seeks summary judgment on its counterclaim for breach of contract against B & K. Federal seeks to recover $34,874 of premium, which it claims is still due under the 1995–1996 policy. This is the same claim for which B & K sought declaratory judgment relief above. B & K also asserted in its claim for declaratory judgment relief that Federal has retained $14,549.51 that was paid in premium for the 1996–1997 policy, claiming that this amount should be applied to whatever amount is still owed on the 1995–1996 policy. B & K takes the position that the 1996–1997 policy was canceled "flat" because Federal did not provide coverage for its operations in Kentucky; therefore, Federal was not entitled to retain any of the premium that had been paid on the 1996–1997 policy.

Before examining the claims of the parties with regard to these two policies, it is necessary to review the general rules for the construction of insurance contracts in Kansas.

■ The construction of an insurance contract is a question of law. *U.S. Fidelity & Guar. Co. v. Morrison Grain Co., Inc.*, 734 F.Supp. 437, 442 (D.Kan.1990), *aff'd*, 999 F.2d 489 (10th Cir.1993); *Wing Mah v. United States Fire Ins. Co.*, 218 Kan. 583, 545 P.2d 366, 369 (1976) (quoting *Goforth v. Franklin Life Ins. Co.*, 202 Kan. 413, 449 P.2d 477 (1969)). If the relevant facts are admitted, the court may decide whether they come within the terms of the contract. *U.S. Fidelity*, 734 F.Supp. at 442; *Wing Mah*, 545 P.2d at 369 (quoting *Goforth*, 202 Kan. 413, 449 P.2d 477).

■ An insurance contract, like any other contract, must, if possible, be construed so as to give effect to the parties' intent. *Westchester Fire Ins. Co. v. City of Pittsburg, Kansas*, 768 F.Supp. 1463, 1467 (D.Kan. 1991); *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 840 P.2d 456, 459 (1992); *Farm Bureau Mut. v. Old Hickory Cas.*, 248 Kan. 657, 810 P.2d 283, 286 (1991). This is to be accomplished by considering the policy as a whole and taking into account the circumstances of the parties. *Coleman Co., Inc. v. California Union Ins. Co.*, 960 F.2d 1529, 1532 (10th Cir.1992); *Reynolds v. S & D Foods, Inc.*, 822 F.Supp. 705, 707 (D.Kan. 1993).

■ Where an insurance contract is unambiguous, the court must enforce the contract as made and not make another contract for the parties. *Catholic Diocese of Dodge City*, 840 P.2d at 459; *Farm Bureau Mut.*, 810 P.2d at 286. The court must take unambiguous language in its plain, ordinary, and popular sense. *Wing Mah*, 545 P.2d at 369 (quoting *Bramlett v. State Farm Mut. Ins. Co.*, 205 Kan. 128, 468 P.2d 157 (1970)). Where there is no ambiguity, there is no need for either judicial interpretation or the application of liberal rules of construction. *Am. Media, Inc. v. Home Indem. Co.*, 232

Kan. 737, 658 P.2d 1015, 1019 (1983)(quoting *Goforth,* 449 P.2d at 481). That is, the court must enforce an unambiguous contract according to its terms. *Id.*

■ Like any contract, an insurance contract may be ambiguous. However, the court should not strain to create an ambiguity where, in common sense, none exists. *See, e.g., Miner v. Farm Bureau Mut. Ins. Co., Inc.,* 17 Kan.App.2d 598, 841 P.2d 1093, 1105 (1992)(noting that "[i]t [is] not a function of the trial court to create an ambiguity requiring an interpretation favorable to the insured when no ambiguity exist[s]"); *Bell v. Patrons Mut. Ins. Ass'n,* 15 Kan.App.2d 791, 816 P.2d 407, 409 (1991)(noting that the court should not strain to create ambiguity).

■ "To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Catholic Diocese of Dodge City,* 840 P.2d at 459; *Patrons Mut. Ins. Ass'n v. Harmon,* 240 Kan. 707, 732 P.2d 741, 745 (1987). Ambiguity does not arise until the application of the rules of interpretation to the face of the contract leaves it uncertain which of two or more meanings is proper. *Id.*

■ Where a contract is ambiguous, the construction most favorable to the insured prevails. *Am. Media, Inc.,* 658 P.2d at 1019 (quoting *Fancher v. Carson–Campbell, Inc.,* 216 Kan. 141, 530 P.2d 1225, 1229 (1975)); *Wing Mah,* 545 P.2d at 369 (quoting *Goforth,* 449 P.2d at 481). This is so because the insurer, as the one who prepared the contract, must suffer the consequences of failing to make the terms clear. *Westchester Fire,* 768 F.Supp. at 1467. *See also Dronge v. Monarch Ins. of Ohio,* 511 F.Supp. 1, 4 (D.Kan.1979)(comparing insurance contracts to adhesion contracts); *Gowing v. Great Plains Mut. Ins. Co.,* 207 Kan. 78, 483 P.2d 1072, 1074–75 (1971)(comparing insurance contracts to adhesion contracts).

■ Even though ambiguous, the language of the contract still must be construed, if possible, in a manner that gives effect to the intentions of the parties. *Dronge,* 511 F.Supp. at 4. However, the test is not what the insurer subjectively intended the terms to mean, but rather what a reasonable person in the insured's position would have understood the disputed terms to mean. *Westchester Fire,* 768 F.Supp. at 1467; *Dronge,* 511 F.Supp. at 4; *Am. Media, Inc.,* 658 P.2d at 1019 (quoting *Fancher,* 530 P.2d at 1229).

■ Both parties agree that B & K owes some amount of premium on the 1995–1996 policy. The dispute here simply involves the calculation of the amount. Federal argues that, according to the applicable rules and policies, the amount of premium still owing on the policy had to be calculated at the rates charged in Iowa. B & K, on the other hand, asserts that the rules and policies applicable to the 1995–1996 policy require that the remaining amount of premium be calculated at the rates for each state in which B & K was doing business.

It appears to the court that this lawsuit has evolved from a series of misunderstandings between the parties regarding the coverage that would be provided by the insurance policies. This misunderstanding centers around the policy provisions relating to "3.A. coverage" and "3.C. coverage." The policy provides coverage pursuant to the workers' compensation law of the states listed in section 3.A. of the information page. In this case, the only state listed in section 3.A. was Iowa. However, the policy can also provide some coverage for states listed under section 3.C. of the information page.

The sections of the policies relevant to this case include the following.

From the "General Section" of the policy:

**E. Locations**

This policy covers all of your workplaces listed in Items 1 or 4 of the Information Page; and it covers all other workplaces in Item 3.A. states unless you have other insurance or are self-insured for such workplaces.

From "Part Three—Other States Insurance" of the policy:

**A. How This Insurance Applies**

1. This other states insurance applies only if one or more states are shown in Item 3.C. of the Information Page.

2. If you begin work in any one of those states after the effective date of this policy and are not insured or are not self-insured for such work, all provisions of the policy will apply as though that state were listed in Item 3.A. of the Information Page.

3. We will reimburse you for the benefits required by the workers compensation law of that state if we are not permitted to pay the benefits directly to persons entitled to them.

4. If you have work on the effective date of this policy in any state not listed in Item 3.A. of the Information Page, coverage will not be afforded for that state unless we are notified within thirty days.

**B. Notice**

Tell us at once if you begin work in any state listed in Item 3.C. of the Information Page.

From "Part Five—Premium" of the policy:

**A. Our Manuals**

All premium for this policy will be determined by our manuals of rules, rates, rating plans and classifications. We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance.

Plaintiff argues that premium for payroll in states listed in 3.C. should be figured at the rate for each 3.C. state in which work was done because the policy states in Part Three that "all provisions of the policy will apply as though that state were listed in Item 3.A. of the Information Page." Plaintiff also quotes subsection C.4. of the NCCI rule for extra-territorial auditing procedure, which states that "[t]he payroll of the employees who are hired for a specific job project should be assigned to the state in which the job is located." Therefore, plaintiff insists that counterclaimant Federal wrongfully figured its premium at the Iowa rate for all of its payroll, including payroll for jobs in 3.C. states.

Although Federal agrees that the NCCI rule providing the extra-territorial auditing procedure is the one applicable to this case, Federal argues that B & K is seeking to apply the incorrect subsection. Instead, Federal argues that the portion of that rule which would apply in this case is subsection C.3., which states in pertinent part as follows:

... If any of these employees or superintendents are assigned to a job which is located in a state other than the headquarters' state either for the duration of the job or any portion thereof, their payroll should be assigned to the highest rated of either the state in which the job is located or the headquarters' state.

Federal further argues that their interpretation is supported by the deposition testimony of Karen Rodriguez, an NCCI corporate representative. Federal argues that the portion of the extra-territorial rule found in subsection C.4. only applies to 3.A. states, and the only 3.A. state listed on B & K's policy was Iowa.

Although the extra-territorial auditing rule does not specifically state that subsection C.4. only applies to 3.A. states, the court finds that this interpretation is consistent with the deposition testimony of both Karen Rodriguez of NCCI and Ken Phillips, the Travelers auditor who performed the audit for the 1995–1996 policy on behalf of Federal. *See* Rodriguez deposition at 30–36 and Phillips deposition at 32–60. Specifically, Phillips stated that "[i]t is impossible to apply the rates for the 3.C. states because we aren't providing primary coverage there." Phillips deposition at 58. Plaintiff does not offer any evidence that this extra-territorial auditing rule has ever been applied differently.

In fact, plaintiff's interpretation would not make much sense, given that plaintiff worked in Wisconsin during the 1995–1996 policy, a state where Federal could not write insurance at the time and a state which plaintiff never had listed as a 3.C. state. *See* Phillips deposition at 48–50. In addition, plaintiff also performed work in Indiana during the effective period of the 1995–1996 policy; however, Federal could only write 3.C. coverage for Indiana, not 3.A. coverage. Furthermore, the statement quoted above in Part Three, Section A.2. of the policy that "all provisions of the policy will apply as though that state were listed in Item 3.A." does not help plaintiff because the policy specifically

states in another section that premiums will be determined according to Federal's manuals, which could differentiate between 3.A. and 3.C. states. Therefore, the court finds that there is no genuine issue of material fact with respect to the amount of premium that B & K owes Federal on the 1995–1996 policy and that B & K owes the full amount of $34,874 to Federal for the 1995–1996 policy.

 The issues surrounding B & K's set-off claim, however, are not as clear. Plaintiff argues that it canceled the 1996–1997 policy "flat," meaning that the cancellation would have been effective as of the date of issuance and the policy would have provided no coverage. Plaintiff took this action after discovering that Kentucky was not listed as a 3.C. state on the 1996–1997 policy because Federal could no longer write insurance for Kentucky. Therefore, plaintiff asserts that the $14,549.51 that Federal retained as premium on the 1996–1997 policy should be used to offset whatever amount B & K owed on the 1995–1996 policy.

Defendant Federal, on the other hand, argues that B & K has not pleaded an affirmative defense entitling it to an offset of the premium retained by Federal. However, the court notes that B & K did argue this with respect to its declaratory judgment action, and, since the parties have admitted that the declaratory judgment action and the counterclaim involve the same issues, the court has consolidated B & K's arguments on the declaratory judgment claim with Federal's counterclaim. Furthermore, the court notes that this will not prejudice Federal because it responded to B & K's set-off argument for the declaratory judgment claim along with the other defendants in their joint motion for summary judgment and their joint reply.

In response to B & K's set-off argument, Federal argued that it had earned the amount that was retained as premium for the 1996–1997 policy. Federal further argued that B & K could not blame Federal for its misunderstanding over what coverage was provided. However, the court does not believe that the parties have sufficiently briefed the issues of whether the policy was canceled "flat," whether Federal was entitled to retain the premium for partial performance of the 1996–1997 policy, and, if so, whether Federal was entitled to retain the entire amount of

$14,549.51. Therefore, the court finds that the plaintiff and defendant Federal must further brief these issues.

**IT IS THEREFORE BY THE COURT ORDERED** that the defendants' Motion for Summary Judgment (Doc. 20) is granted. Plaintiff's claims for a declaratory judgment will be consolidated with defendant Federal's counterclaim and treated as defenses to the counterclaim. Defendants are granted summary judgment on plaintiff's claim for tortious interference with a prospective business advantage.

**IT IS FURTHER ORDERED** that Counterclaimant Federal Insurance Company's Motion for Summary Judgment (Doc. 18) is granted in part and taken under advisement in part. Counterclaimant Federal's motion is granted with respect to its claim for $34,874 for premium due for the 1995–1996 policy. Counterclaimant Federal's motion is taken under advisement with respect to plaintiff's set-off claim relating to the $14,549.51 in premium retained by Federal for the 1996–1997 policy period.

**IT IS FURTHER ORDERED** that Counterclaimant Federal and plaintiff will further brief the issues involving Federal's retention of $14,549.51 in premium for the 1996–1997 policy period. Counterclaimant Federal will submit its brief to the court no later than **June 12, 1998.** Plaintiff will submit its response no later than **June 26, 1998.** Counterclaimant Federal will submit its reply no later than **July 10, 1998.**